[S. F. No. 1365. In Bank.—January 11, 1901.]

J. M. McNAMARA, Appellant, v. OAKLAND BUILDING AND LOAN ASSOCIATION, Respondent.

Building and Loan Associations—Maturity of Secured Debt—Amendments to Civil Code—Election.—The maturity of a debt, secured by a mortgage and pledge of shares, which is apparently due to a building and loan association organized prior to the amendments of 1891 to the Civil Code, which did not elect to continue its existence under section 646 of that code, as then amended, is not affected by those amendments, the provisions of which do not apply.

Id.—Rights of Parties—How Governed.—The rights of building and loan associations and their shareholders, including those who have obtained loans therefrom, are governed by the statutes applicable thereto and the by-laws framed thereunder, and the valid contracts entered into between them.

Id.—Scheme of By-laws—Maturity of Debt—Uncertain Maturity of Shares—Cancellation—Foreclosure.—Where the scheme of by-laws allowed by the statutes governing a building and loan association contemplated an uncertain period for the maturity of its shares, and there was no agreement that the shares of stock pledged as collateral security for a loan upon mortgage to a shareholder for a fixed period shall mature at the maturity of the debt, the borrower is not entitled to have the mortgage canceled at its maturity if the stock is not then matured; but if no further payments are made, the building and loan association is entitled to foreclose the mortgage and sell the pledged shares to pay the matured debt.

Id.—Dual Relation of Borrower and Stockholder—Payments on Collateral Shares.—In such case the mortgagor and pledgor of the shares as collateral occupies the dual relation to the corporation of borrower and stockholder, each of which is distinct from the other; and payments made on the collateral shares pledged were not payments on account of the debt they secured.

Id.—Offset of Payments and Earnings—Provision for Benefit of Mortgagee—Option.—Where there is no by-law or agreement giving to the mortgagor the right to offset his payments and earnings against the mortgage debt, he cannot do so; and a provision in the mortgage giving to the mortgagee an option to apply on the mortgage note the cash surrender value of the shares, etc., and to take the shares as his property, is for the benefit of the mortgagee only, and gives no right to the mortgagor to demand such application, and does not compel the mortgagee to make it.

Id.—Provision for Withdrawals—Deductions—Payment of Loan—Consent of Directors.—In the absence of statutory provisions, the association may fix the terms on which members may withdraw, and a provision for withdrawals by stockholders, and for their receiving the dues paid, with interest, less certain deductions, but that no member could withdraw who had taken a loan until it was fully paid, unless by consent of the directors, is valid and binding.

Id.—Premium Deducted from Loan—Estoppel of Borrower—Violation of By-law by Directors.—A stockholder who received a loan under by-laws providing for a premium to be deducted from the principal of the loan, and who, after deduction of the premium and knowledge of the effect of his contract, made payments upon the principal sum fixed, cannot insist that he would not have signed the note had he known the facts; and where he consented to pay a premium of twenty per cent fixed by the

CXXXI. Cal.—22

directors for all borrowers, he is estopped to complain that the by-laws were violated by not loaning out the money in open meeting to the highest bidder, and cannot urge in an action to foreclose his mortgage that the association suffered by such action of the directors.

ID.—ALLOWANCE OF ATTORNEYS' FEES—PROVISION IN MORTGAGE—ACTION OF COURT WITHOUT TESTIMONY.—Where there is no evidence that the attorney acting for the building and loan association in the foreclosure of its mortgage was paid a salary or other compensation by the corporation, and the mortgage, in terms, provides for reasonable attorneys' fees to be secured thereby, the conclusion of law that the association is entitled to recover attorneys' fees rests upon the provision in the mortgage, and the court may determine what amount would be reasonable without hearing any testimony thereupon.

ID.— PLEADING — FINDING.— The complaint need not aver that the amount of attorney's fee claimed is reasonable, nor need there be a finding to that effect.

ID.—EQUITABLE RIGHTS OF MORTGAGEE—VIOLATION OF CONTRACT—ACCOUNTING—CREDIT FOR PLEDGED SHARES SOLD.—The mortgagor who has violated his contract to pay up his pledged shares in full satisfaction of the mortgage has an equitable right to an accounting of the affairs of the association, and to be credited with the sum paid and charged with the sum to be paid at the winding up of his series; but he is only entitled in equity to be credited on the mortgage debt with the value of the pledged shares when sold in the open market.

ID.— EVIDENCE — VARYING EFFECT OF CONTRACT— UNDERSTANDING OF MORTGAGEE—REPRESENTATION OF OFFICER.—Evidence tending to vary the effect of the contracts entered into by the mortgagor, by showing that he did not comprehend their full meaning, and that he understood from the representation of one of the officers of the association that the stock would mature in seven years, is properly excluded.

APPEAL from a judgment of the Superior Court of Alameda County and from an order denying a new trial. John Ellsworth, Judge.

The facts are stated in the opinion.

R. Clark, and W. H. Linforth, for Appellant.

John Yule, for Respondent.

CHIPMAN, C.—Plaintiff's action is to cancel a mortgage given by plaintiff to defendant's assignor, Oakland Building,

Savings and Loan Association, upon certain real property in the mortgage described, and for the recovery of three fully paid-up shares in said association or their par value, to wit, $300. The complaint contains a copy of the mortgage and the note for the payment of which it was security. Defendant answered December 30, 1896, and at the same time served and filed a cross-complaint against plaintiff for judgment on the note, for the foreclosure and sale of the mortgaged premises, and for the sale of certain fifteen shares of the capital stock of defendant's assignor, which had been pledged by the terms of the mortgage, as further security. The court found as conclusions of law that plaintiff was entitled to no relief; that there is due from plaintiff to defendant the principal sum of the note, to wit, $1,200 and interest at eight per cent per annum from September 1, 1896, amounting to $76; also attorneys' fees amounting to $250, and to costs of suit, and that defendant is entitled to decree of foreclosure and sale of the land mortgaged and of the said shares. Judgment was accordingly entered, from which, and from the order denying his motion for a new trial, plaintiff appeals.

Defendant and its assignor were incorporated under title XVI, part IV, division I, of the Civil Code of this state—the latter about October 3, 1889, and the former about April 24, 1890; neither of said corporations elected to continue its existence under section 646 of the Civil Code as amended by the act of March 31, 1891. (Stats. 1891, p. 252.) The court found the following facts: That in October, 1889, defendant's assignor loaned to plaintiff the sum of $1,200, plaintiff executing to it his promissory note for that amount, payable to said corporation, or order, six years after date, bearing eight per cent interest, payable monthly in advance, to be compounded if not so paid, and in case of default in paying any monthly interest the payee was given the option to deem the principal to be due; the note recited that it was secured by mortgage of even date and a pledge of fifteen shares of the capital stock of the mortgagee series No. 1; defendant's assignor, mortgagee, "at a meeting of its directors, September 5, 1889, fixed the premium on all loans which it should make to borrowers at twenty per cent on amount of loan made," and fixed the rate of interest at eight

per cent.  Before plaintiff executed said note he was informed of this premium charge and that the amount thereof, $240, would be included in the amount of the note given by him, and that interest would be charged on the whole amount.  He received the sum of $960 and no more, but gave his note for $1,200.  The mortgage was duly recorded October 16, 1889. Plaintiff paid to defendant's assignor, as provided in the mortgage, the sum of $139.50, down to May 5, 1890, and no more, of which $72 were paid for and applied to the interest on said note, and $67.50 were paid and applied on account of the purchase price of said shares.  Without the knowledge of plaintiff, defendant's assignor transferred to defendant the note and the security on May 5, 1890.  Defendant had no knowledge of any agreements between its assignor and plaintiff except as contained in the said written instruments, except that it was understood and agreed between plaintiff and defendant that if plaintiff should pay the interest as provided in the note, and should pay the monthly installments on said shares as provided in said mortgage, "then in that event, and as soon as and when the said fifteen shares of stock with the installments paid in, and the interest and proportional profits of said shares of stock should and would equal $100 per share, said corporation would thereupon satisfy said mortgage . . . . and surrender to plaintiff three shares of said stock . . . . paid up."  Beginning with the month of June, 1890, and to August, 1896, plaintiff paid to defendant, agreeably to the mortgage, the sum of $1,162.50, and no more, of which the sum of $600 was for interest on said note, and $562.50 on account of the purchase price of said shares, and was full payment for interest and installments on said shares to and including August, 1896, but such payments were insufficient to mature said stock or make it of value of $100 per share, or any value greater than $70.20.  No part of the principal of said note has been paid, and of the interest only to August 31, 1896, and no more.  The monthly installments on said shares have been paid to include August, 1896, and no more.  At the commencement of the action defendant had no money in its possession belonging to plaintiff.

Appellant contends that the evidence is insufficient to sustain the findings, specifying each separately.  We will endeavor

to deal with such as seem to present the salient features of appellant's contention.

1. Appellant claims that the debt was not due when the action was commenced. The note was dated October, 1889, and was payable six years after date, or October, 1895; the suit was commenced September 15, 1896, and the cross-complaint was filed December 30, 1896. It is not disputed that on the face of the instrument the action to foreclose could be brought, but it is contended that by the provisions of the act of 1891, *supra,* it was prematurely brought. It is sufficient answer that neither defendant nor its assignor elected to continue its existence under section 646 of the Civil Code. The provisions of the act of 1891 do not apply.

It may be here observed, for it concerns the further examination of plaintiff's points, that we have nothing to guide us in determining the rights of the parties except as we find it in the statute relating to these associations, and in the by-laws framed thereunder, and in the contracts entered into. Associations kindred in character to that of defendant and its grantor exist in many of the states of the Union, and also in England, where they had their origin. Although transplanted into this country in comparatively recent years, they have given rise to much litigation, and the decisions on many questions are far from harmonious. Naturally, too, the decisions vary because of different statutory provisions under which the cases have been decided. Our code provisions governing these associations are principally drawn from the act of May 20, 1861 (Stats. 1861, p. 567), and as we have no previous decisions of this court on the subject, it appears to be necessary to give at least an outline of the statutory provisions under which defendant and its assignor were organized. They are found in sections 639 to 647, inclusive, of the Civil Code as they stood prior to the amendments of March 31, 1891. The corporation may be organized with or without a capital stock, and may raise funds in shares not exceeding two hundred dollars each, payable in periodical installments (sec. 639); it may borrow money to carry on its objects (sec. 640); it may purchase real estate and erect buildings for its members, and may make loans to its members for the purpose of aiding them to acquire and improve real estate (sec. 641); it may in-

sure the lives of its members and debtors (sec. 642); it may pur-
chase and hold real estate for purposes named (sec. 643). Sec-
tion 644 is the one most important in determining the ques-
tions before us. It provides that: "The by-laws of such corpo-
rations must specify the amount of the periodical subscriptions
or payments to be made by each member, the time and manner
in which such payments are to be made, the fines and forfeiture
for default, . . . . the terms and conditions upon which loans
may be made to its members and by them repaid to the corpora-
tion, the manner in which a person may become and cease to be
a member, the conditions on which members may withdraw
from the corporation, and the provisions for the payment to
withdrawing members of the sums of money due to them. aris-
ing from subscriptions or payments, and the proportion of the
profits such withdrawing member may receive on withdrawal."
Section 645 requires the secretary once each year to prepare a
full and explicit statement of the corporation affairs, and print
the same in one or more newspapers and circulate the statement
among the members. Section 646 was repealed in 1874, as also
was section 648. Section 647 provided for the consolidation of
two or more such corporations, or the transfer of the engage-
ments and the funds and property of one to another, but not
to the prejudice of the right of any creditor of either corpora-
tion. It will be noticed that the provisions place but few re-
strictions upon the corporation. The legislative injunction, of
greatest importance to members, is found in section 644, and
that section in effect and in terms requires the corporation to
outline and define its scheme in the by-laws. The act of 1891,
*supra*, made many and important changes and additions to the
law, apparently with some intelligent reference to the law in
other states and to the better established systems for such as-
sociations. But with this later act we can have no concern, and
much of the learning found in the decisions of the courts of
other states and many of the principles laid down elsewhere for
the government of this class of corporations are of but little
value in the present case.

Plaintiff's action appears to have been brought upon the
theory that at the end of six years, having made all his pay-
ments, he was entitled to have his mortgage canceled, and as

he had subscribed for fifteen shares and borrowed only on twelve shares, he was entitled to have three shares returned to him fully paid. It is not improbable that representations were made that the series to which his shares belonged would mature in six years; the maturity of the mortgage debt points that way, but there is nothing in the evidence, and plaintiff offered no legal evidence to show that there was any agreement that such would be the result. On the contrary, as we shall see, the by-laws plainly contemplated an uncertain period for the maturity of the stock.

2. Appellant contends that if payment of the note could be enforced, he had the correlative right to offset his payments and his earnings, and that if he is granted this right it will appear from the evidence that the debt is paid. Appellant is mistaken as to the nature of the agreements into which he entered. He occupied the dual relation to the corporation of borrower and stockholder, each of which was distinct from the other. Uuder the scheme he could not be a borrower without becoming a stockholder, but he could be a stockholder without being a borrower. The purposes of the corporation declared in its articles were to accumulate funds upon shares not exceeding one hundred dollars each, payable in one sum or in periodical installments, and from fines, premiums, loans, and interest and other lawful sources to borrow money, and to loan out funds of the corporation to members. A subscriber to the shares was required by article 2, section 2, of the by-laws to pay monthly installments of one dollar per share, "until each share of the series of stock upon which such monthly payments shall be made, together with the earnings of such shares, shall reach the value of $100." (Amended as to borrowing members by allowing them the election to pay fifty cents per month instead of one dollar.) If not a borrower, he could pay in full, if he preferred, and have his paid-up certificate. The scheme, however, was largely one for the loan of money to members, and was so contrived, at least in theory, that by payment of interest on the note and by small monthly payments a member could pay for his shares, and if not otherwise in default, upon surrender of the shares fully paid up to the association it operated to pay his loan. A member was entitled to borrow upon the security

of his subscribed shares, and such other security as was required, one hundred dollars for each share. But the by-laws provided that the "mortgages, bonds, or other securities shall remain in force and on deposit as collateral security until each member shall have received satisfaction in full for his or her claim of one hundred dollars per share, whereupon the mortgage or mortgages shall be canceled, and collateral bonds or other securities returned to said borrower or borrowers." As plaintiff subscribed for fifteen shares and only borrowed $1,200, he would, if he had made all required payments, have been entitled to three shares fully paid up, and would also have been entitled to have the mortgage canceled. Provision was made for withdrawals, whereby a stockholder could withdraw and receive the amount of dues actually paid upon each share, with interest, after some deductions provided for, but no member could withdraw who had taken a loan until such loan was fully paid, unless by the consent of the directors. It was competent for the association to fix the terms on which members might withdraw, in the absence of statutory provisions. (Endlich on Building Associations, 2d ed., sec. 31.) The code, section 644, gives the association the power to fix by its by-laws the terms on which a member may withdraw. I can find nothing in the by-laws and nothing in the contracts entered into by plaintiff warranting the claim that, notwithstanding he had defaulted in his payments on the mortgage and also on his shares, he still had the right to offset his payments previously made against the amounts still due from him. The only clause in the mortgage bearing upon the point is one that, in case of foreclosure, gives to the mortgagee the option, without notice to the mortgagor, to apply on the mortgage note the cash surrender value of the shares, less all fines, penalties, etc., and thereupon the shares should become the property of the mortgagee. But this gives the mortgagor no right to make the offset nor does it compel the mortgagee to do so. The mortgagor, having ceased all payments, and by suit having sought to compel the cancellation of his mortgage, the mortgagee is within its rights in asking a foreclosure of the mortgage and a decree for the sale of the shares, and presumably they will bring their cash value and plaintiff will have his credit therefor. That the relations of borrower

and stockholder are separate and distinct, in associations such as defendant's assignor, seems to be well settled (Endlich on Building and Loan Associations, 2d ed., secs. 123, 477); and it is general law that payments on account of collaterals are not payments on account of the debt they secure; the pledging of shares as collateral security for the payment of the debt "is a recognition of the distinct standing of the member as a member, and as a debtor." (Endlich on Building and Loan Associations, sec. 477, and cases cited.)

3. It is contended by plaintiff that the evidence does not support the finding that a premium on the loan was fixed at twenty per cent or any other sum, and that there is no evidence that he agreed to pay a premium. He complains also that he was entitled to a loan of $1,500, for which he applied, but received only $960, and should be compelled to pay the latter sum, if any, and no more. It is true that plaintiff applied for $1,500, and that the by-laws entitled him to a loan of $100 on each share. It is true, also, that he received but $960, for which he gave his note for $1,200. The evidence is sufficient, we think, to support the finding that plaintiff knew he was to pay a premium. He had a copy of the by-laws, as all members had, and these by-laws provided that the premium bid should be deducted from the principal; he paid interest on the note and installments on the shares for several years, and must have known for what he was paying. The proceedings of the directors show that, at a meeting held September 5, 1889, when plaintiff's and other loans were allowed, the premium was fixed at twenty per cent. The note called for $1,200, and included $240 premium, leaving $960 for the borrower. This was part of the plan for creating funds, in which plaintiff shared with other members, into which he entered with his eyes open. He testified that he would not have signed the note had he understood that he was to receive but $960, and it appeared that the money was not in fact paid until after the note and mortgage were delivered. Still, plaintiff does not allege nor attempt to prove fraud, and he made so many payments voluntarily after he must have known the full effect of his contracts, that his testimony that he would not have signed the note had he known the facts cannot avail him.

The proceedings of the corporation directors show that the loan was allowed to plaintiff for $1,500. We cannot see that he can complain that the directors finally found that they could loan him but $1,200. He certainly could not expect to receive $1,500 on his note for $1,200, and if he had received $1,200 in money his note must have been for $1,500 to include the premium. The by-laws required that the money should be "loaned out in open meeting to the highest bidder or bidders. The premium bid shall be deducted from the principal," etc. The premium in this case was not thus determined, but as plaintiff consented to pay it as fixed by the directors, we do not see that he can complain of this violation of the by-laws. All the applicants for loans at that time were successful. No one of them suffered by the failure of the directors to invite public bids for the money. If the association suffered, the matter cannot be inquired into in this action. If, as we have said, the by-laws were not strictly pursued, the plaintiff cannot complain in this action. Indeed, as a member, having himself been a party to the violation and receiving the benefits thereof, he ought not to be heard to complain.

4. Appellant claims that it was error to allow attorney's fee, for the reason that the attorney of defendant was its regular salaried attorney; citing the by-laws which prescribe the duties of the corporation attorney and provide that he should receive such compensation as the directors should determine. Some of the early proceedings of the corporation defendant show that its attorney in this action was its regularly appointed attorney, but there is no evidence that he occupied that relation when this suit was brought, and if there were any such evidence it does not appear that he was paid a salary or other compensation by the corporation. The by-laws authorize such compensation to be made, but do not fix the amount. Plaintiff has not brought the case within the rule laid down in *Bank of Woodland v. Treadwell*, 55 Cal. 379.

The mortgage in terms provides in case of foreclosure the mortgagor shall pay reasonable attorneys' fees, "and the payment of such costs and expenses and attorneys' fees by the mortgagor is secured hereby." The cross-complaint contains an averment setting forth the provisions of the mortgage and

alleging that the attorneys' fees therein provided for were se-
cured thereby and the prayer asks for reasonable attorneys' fees.
There is no allegation that the sum claimed is reasonable, nor
is there any finding of the fact, and therefore it is claimed de-
fendant is not entitled to attorneys' fees.   It is found that
plaintiff executed the mortgage, which is equivalent to a finding
that he agreed to pay a reasonable attorney's fee for the mort-
gage so provided.   The averment that the fee claimed was a
reasonable amount is not necessary (*Carriere v. Minturn,* 5 Cal.
435); the attorney's fee was not the cause of action, but an in-
cident to it.   (*Mulcahy v. Buckley,* 100 Cal. 484; affirming
*Carriere v. Minturn, supra.*   See, also, *Brooks v. Forington,* 117
Cal. 219.)   *Prescott v. Grady,* 91 Cal. 518, does not overrule or
conflict with *Carriere v. Minturn, supra.*   As an averment was
unnecessary, so also was a finding.   The conclusion of law that
defendant was entitled to recover attorneys' fees rested upon
the provisions of the mortgage, and the court could determine
what amount would be reasonable without hearing any testi-
mony thereon.   (*Pacific Mut. L. Ins. Co. v. Fisher,* 106 Cal. 234;
*Clancy v. Plover,* 107 Cal. 272; *Edwards v. Grand,* 121 Cal. 254.)

5. Appellant contends, also, that he was entitled to have an
account taken and all of the money paid by him credited on the
debt, and a finding as to the duration of the association and
judgment against him for the amount he would have to pay
at the winding up of his series.   (Citing Endlich on Building
and Loan Association, secs. 130, 134, 444, 445.)   It was proved
by a witness, conceded by both sides to be an expert accountant
and familiar with the workings of defendant and other like
corporations, that plaintiff's shares had not matured September
15, 1896, when the action was brought, and that if the earnings
continued to be what they had been in the past, i. e., what was
termed thirteen and five-sevenths per cent monthly compound,
it would take eight and two-thirds years from the time payments
commenced for the shares to mature.   But the witness said it
could not be ascertained certainly in advance when the series
would mature, for the obvious reason that the earnings were an
unknown quantity for the future.   We cannot see that there
is anything in the plan upon which defendant and its assignor
were operating that would permit a shareholder, who was a

mortgagor, to default in payments of interest and principal of his note and installments on his shares, and still entitle him to claim the full benefit of all his previous payments whenever he chose to default. Nor can we see how an accounting could be taken of the unascertainable earnings of a going concern, the shares of which mature at no fixed period, so as to protect other shareholders. Nor can we see that any equitable principle would warrant our holding that defendant should pay back to plaintiff moneys which, by the terms of his agreement, were to be surrendered upon his default for the benefit of the other shareholders. We have already seen that he gets the present cash value of his shares by public sale, the proceeds to be credited on his notes. Whether the investment is a wise one to the borrower, who makes all required payments, we are unable to say, but it is clearly not so to one who cannot persist in his payments until the scheme closes, or until the series to which his shares belong has matured. We cannot find, however, either in the statute or in the by-laws, or in the contracts entered into, any authority for equity to interpose so as to aid the unfortunate borrower in the situation of plaintiff. Mr. Endlich says (section 149): "There is obviously a great difference between the case of a member who has fulfilled faithfully all the requirements of his undertakings with the building association, of those which relate to the duties of membership generally, as well as those which pertain to his position as a borrower, and that of a member, who, after obtaining an advance, neglects both classes of obligations, and renders himself liable to compulsory proceedings on the part of the society, which the latter is bound to institute all the more rigorously, as the success of the whole scheme depends upon the performance of all his duties as a member. Whatever, therefore, may be the advantages allowed to members voluntarily repaying loans, these provisions have no application, and offer no immunities to those who become defaulters, and are upon that ground sued by the association upon the covenants of their obligations. Having thus violated the rules of the society, they are not entitled to the benefits held out to those who keep them, nor are they within the meaning of the statute designed to favor the conscientious borrowers." (See the subject

further treated at sections 480-82.) We have seen that plaintiff will receive as a credit on his debt the value of his shares when sold; and as these shares represent his interest in the association, he will thus receive all that he is entitled to, as a defaulter, upon any principle of equity. This cash value was shown to be $70.20 per share, or $1,060.50 for fifteen shares. In an elaborate and well-considered opinion, which Mr. Endlich regards "as definitely conclusive upon the controversy" (section 482), Paxson, J., in *Watkins v. Workingmen's Bldg. etc. Assn.*, 97 Pa. St. 514, holds that in a suit brought against the borrower the value of the defendant's stock for the purpose of application to the extinguishment of his debt is "just what the defendant has paid on account thereof. This was all . . . . the law gave him the right to apply. The value of stock beyond this consisted mainly of profits, in which a defaulting borrower has no right to participate." The learned justice then proceeds to show why this must be so. We are not called upon to affirm or deny this doctrine, and I refer to it to show that full equity is done in giving plaintiff the benefit of the value of his shares by sale in the open market. He paid on account of his shares $630 in all, as found by the court; it is possible that the shares will sell for much more than this sum, as their cash value was proven to be $1,060.50 at the time the action was brought.

Appellant assigns numerous errors occurring at the trial, most of which, however, depend more or less upon propositions already noticed. Appellant offered the testimony of plaintiff to show that when he purchased the shares he was told by some one, acting for the corporation, that his stock would mature in seven years. Again, he was asked whether Colonel McMullen (one of the directors) ever represented to him as to the time when the stock would mature or the loan be discharged. Again, he was asked how he understood that he was to pay the note and mortgage and other similar questions as to his understanding of the transaction and his motive in entering into the engagement and like matters. We have examined this series of questions with some care, and while some of them, perhaps, were admissible, although their exclusion did no harm, the information sought was properly excluded. Under

the issues in the case plaintiff could not vary the effect of his contracts by showing that he did not comprehend their full meaning.

We advise that the judgment and order be affirmed.

Gray, C., and Britt, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are affirmed.

McFarland, J.,     Van Dyke, J.,
Garoutte, J.,     Henshaw, J.,
Harrison, J.