# FIDELITY SAVINGS ASSOCIATION v. BANK OF COMMERCE ET AL.

BUILDING AND LOAN ASSOCIATIONS—OWNERSHIP OF STOCK—LOANS—INTEREST—PREMIUM—FINES—STOCK DUES—UNCONSCIONABLE CONTRACT—EVIDENCE—FINDINGS—ACCOUNTING.

1. One W. having applied for and received a certificate for shares in a building and loan association, his assignment of the same to his wife, which was accepted and recognized by the association, constituted her the owner of the shares.

2. W., the owner of a certificate of stock in a building and loan association, assigned the same to his wife, which assignment

was accepted by the association, and a new certificate was issued to her for the same shares, and, in her application to the association for a loan and in her note, she recited her ownership of the shares, and there was no denial on her part of such ownership; *Held,* in this suit brought by the purchaser of the property mortgaged to secure the loan to redeem therefrom, that a finding that the new certificate was never delivered to the wife, and that its issue was mere pretense, was not supported by the evidence; it appearing further that the plaintiff alleged that the mortgagors, W. and wife, duly assigned the certificate to the association as collateral security and also had transferred their interest therein to the plaintiff.

3.  Nothing in the evidence tending to show that the contract did not accurately express the agreement of the parties, nor indicate fraud, deceit or misrepresentation, a finding that a building and loan association agreed to loan to a shareholder certain money at the rate of six per cent. interest per annum, held not to be supported by the evidence, if intended to cover the entire consideration for the loan, where the contract provided for the payment of a monthly premium in addition to the interest.

4.  There being no evidence to that effect, a finding that certain shares of a building and loan association stock were issued solely as a means to secure a loan afterward made held unsupported by the evidence.

5.  The statute permitting any rate of interest to be agreed upon in writing, the exaction of a monthly premium by a building and loan association upon a loan to a member of the par value of his stock in advance of its maturity is not invalid, though it be treated as an extra interest charge.

6.  A stockholder in a building and loan association who borrows money from the association, assigning to the latter his shares as collateral security for the loan, sustains to the association the dual relation of stockholder and borrower.

7.  Where a member of a building and loan association borrows from the latter in advance of the maturity of his stock the par value thereof, and assigns the same to the association as collateral security for the loan, agreeing to pay the monthly stock dues, as well as the interest and premium on the loan, his relation of stockholder is not terminated, but he continues a member of the association.

8.  Payments of dues upon his stock by a borrowing member of a building and loan association are not *ipso facto* payments

upon his debt to the association for a loan made to him of the par value of his stock in advance of its maturity, nor to be regarded as partial payments operating as a *pro tanto* reduction of the debt, so as to periodically reduce the interest agreed to be paid, although the stock has been assigned to the association as collateral security for the loan.

9. A member of a building and loan association borrowed therefrom in advance of the maturity of his stock the sum of $1,500, the same being the par value of his stock, and received the full amount of the loan, and agreed to pay interest thereon at the rate of six per cent. per annum, and the further sum of sixty cents per share monthly as a premium, the total annual payments amounting to $198, or 13 1-5 per cent. per annum; *Held,* that the exaction of that amount for the use of the money did not render the contract inequitable and unconscionable.

10. A contract between a building and loan association and a member thereof, whereby the former loans to the latter the par value of his stock, delivering to him the full amount thereof, and the latter agrees to pay interest at the rate of six per cent. per annum, together with a monthly premium of sixty cents on every hundred dollars of the loan, and also to pay the monthly stock dues, is not inequitable and unconscionable.

11. Accrued fines against a borrowing member of a building and loan association do not become part of the mortgage debt unless made so by the mortgage.

12. Fines against stock in a building and loan association for defaults in paying stock dues, which are a lien on the stock under the by-laws, are, if reasonable, allowable to the association upon the foreclosure of a mortgage against a borrowing member in determining the withdrawal value of the stock as a credit upon the mortgage debt.

13. The law does not permit the repeated imposition of the same fine increased every month upon the principle of arithmetical progression.

14. To support a claim of the association for fines for default in paying stock dues, it is not enough to show that they were charged, but the facts should be shown as a basis for the liability, and so that their reasonableness may be determined.

15. In this suit to foreclose a mortgage given to a building and loan association by a borrowing member, *Held,* that the debtors should be charged with the principal sum, together

with interest and premium due and unpaid up to the date of decree, and the insurance fees paid by the association and interest thereon, upon which should be credited the withdrawal value of the stock.

16. Tenders made to the association before and at the trial having been insufficient to cover the amount due, held insufficient to throw the costs upon the association.

17. Upon the foreclosure of a mortgage for $1,500, the amount due being $1,282.30, an attorney fee of $100, provided in the mortgage, is held allowable to the mortgagee in addition to other costs.

[Decided February 18, 1904.]                    (75 Pac., 448.)

Error to the District Court, Sheridan County, Hon. Joseph L. Stotts, Judge.

Suit to redeem from a mortgage upon real estate held by a building and loan association, in which the defendant filed a cross-petition to foreclose the mortgage. The facts are stated in the opinion.

*Erastus Smith, E. E. Lonabaugh, C. C. Blake* and *Adelbert Hamilton,* for plaintiff in error.

I. The court erred fundamentally in holding the contract "solely a contract of loan" and in eliminating from the transaction the contract of stock subscription and the pledge of the stock as collateral security and the contract provisions as to payment of premium and fines and for final settlement between the parties on the building and loan association plan.

a. All parties to the transaction possessed full legal contractual capacity.

b. The parties thus possessing full legal contractual capacity, deliberately, solemnly and with all the legal ceremonial of writing and ensealment, made the contracts shown in the record.

c. These contracts are all free from deceit, fraud or imposition and are neither unconscionable nor inequitable, nor contrary to public policy.

II. The contracts at bar are Colorado contracts, authorized by Colorado statutes, but enforceable in Wyoming upon principles of interstate law and comity. (Bennett v. Eastern B. & L. Assn., 177 Pa. St., 233; Pioneer Sav. & Loan Assn. v. Cannon, 36 S. W., 386 (Tenn.); Nat. B. & L. Assn. v. Ashworth, 22 S. E., 521 (Va.); Caesar v. Capell, 83 Fed., 403; Nickels v. People's B. & L. Assn., 25 S. E., 8 (Va.)

Where the contract does not in express terms declare which law shall govern, and a place of payment is stated in the contract, it is to be construed by the law of the place of payment. (Coad v. Home Cattle Co., 32 Neb., 761; Newman v. Kershaw, 10 Wis., 333; U. S. S. & Loan Co. v. Shain, 77 N. W., 1006 (N. D.); Pioneer S. & Loan Co. v. Cannon, 36 S. W. (Tenn.), 386; Bank v. Rutland, 10 How. Pr., 1; Nickels v. People's B. & L. Assn., 25 S. E., 8 (Va.); Association v. Ashworth, 91 Va., 712; Andrews v. Pond, 13 Pet. (U. S.), 65; R. Co. v. Bank, 79 U. S., 226; Sturdevant v. Bank, 60 Fed., 730; Central Etc. Co. v. Burnham, 83 Ia., 120.)

The fact that the note is secured by mortgage does not change the rule, the real estate being a mere incident. (Jones on Mtgs., Secs. 657, 659a, 660; Story on Confl. of Laws, Sec. 287a; 2 Kent, 460, 461; Edwards on Bills and Notes, 1010; Boone on Mtgs., 86; U. S. S. & L. Co. v. Shain, 77 N. W., 1006 (N. D.); Trust Co. v. Burton, 74 Wis., 329; Bennett v. Assn., 177 Pa. St., 233; Assn. v. Vance, 27 S. E., 274, 692 (S. C.); Assn. v. Hoffman, 27 S. E., 692 (S. C.); Caesar v. Capell, 83 Fed. R., 403; Rector v. Assn., 98 Fed., 171.)

Comity sanctions the enforcement of contracts of one state by courts of another. (Assn. v. Ashworth, 22 S. E., 521 (Va.); Wright v. Lee, 2 S. D., 596, 605; Charter Oak v. Sawyer, 44 Wis., 387; Cone Exp. & Com. Co. v. Poole, 41 S. C., 70; Sawyer v. Dickson, 48 S. W., 903 (Ark.); Bank v. Rutland, 10 How. Pr., 1; Silver v. Worth, 4 Johns Ch., 371; Ins. Co. v. C. D. Jr., 5 Leigh, 471; Saltmarsh v.

Spalding, 147 Mass., 224; British v. Ames, 6 Met., 391; Match Co. v. Roeber, 106 N. Y., 473; Wash. Mill Co. v. Bartlett, 3 N. D., 138; Freie v. Assn., 166 Ill., 128; Columbia B. & L. Assn. v. Junquist, 111 Fed. R., 645.)

III.   The contracts in this record, valid either in Colorado or in Wyoming, should be upheld and enforced, not destroyed.   (2 Pars. on Cont. (7th Ed.), 628, 632, 630, 636, 637;  Bell v. Packard, 69 Me., 105.)

IV.   The District Court acted unconstitutionally in destroying the contracts which the parties had a right to make, and in making for them a contract which The Fidelity Association had no lawful authority to make.   (Fed. Const., Sec. 1 of Art. 4, Sec. 10 of Art. 1, Amendment XIV; Wyo. Const., Sec. 37 of Art. 1, Sec. 35 of Art. 1;  Cooley Const. Lim. (5th Ed.), 493, 434, 436;  Bank v. Oakly, 4 Wheat., 244;  Gelpoke v. Dubugne, 1 Wall., 275;  Bedford v. Assn., 181 U. S., 227.)

V.   The court erred in holding each stock payment was a partial payment on the loan from time to time as such payments on stock were made, and erred when it found that the association was only entitled to recover $750.   Stock payments are not payments on loan.   (4 Ency. Law (2d Ed.), 1057;  State v. Horbacker, 42 N. J. L., 635;  So. Assn. v. Anniston L. & T. Co., 101 Ala., 582;  Post v. Assn., 37 S. W., 216 (Tenn.) ;  Reeves v. Assn., 19 S. W. (Ark.), 917; Tilley v. Assn., 52 Fed., 622;  Endlich on Building Assn. (2d Ed.), Sec. 477 (1st Ed., Sec. 452) ;  Assn. v. Sutton, 35 Pa. St., 463;  Assn. v. Bryan, 54 S. W., 377 (Tex.)

VI.   The bank cannot cancel contracts made by the Wrighters to which it is no party.   (18 Ency. Pl. & Pr., 795; Yeamans v. James, 27 Kan., 195;  Wall v. Cockrell, 10 H. L. Cas., 229;  Leach v. Fowler, 22 Ark., 143;  Gray v. Ullrich, 8 Kan., 112;  Cowan v. Barrett, 18 Mo., 257.)

VII.   A borrower having dealt with an association as a building and loan company and having borrowed its money, is estopped to deny the character of the association, its powers to contract, or the liability to it.   (Manship v. New South B. & L. Assn., 110 Fed., 845.)

*W. S. Metz,* for defendant in error.

The want of equity and the unfairness of the demand of the plaintiff in error is certainly apparent from the statement of facts.

The interest upon this loan of $1,500 from September 26th, 1894, to April 19th, 1900, at the time of the tender of $750 by the Bank of Commerce, amounts to about $500, round numbers. When to this is added the principal of $1,500 of the note, would make the note, with its total interest to the last mentioned date, $2,000. After deducting from this the total sum paid, viz: $1,478, which is admitted in the evidence, will leave a balance of $522. To this should be added the insurance paid by the plaintiff in error of $14, will bring the sum to $536. To cover all possible claims or demands the defendant, Bank of Commerce, tendered the plaintiff in error on April 19th, 1900, $750, which tender was refused by the plaintiff in error, and it demanded judgment for twelve hundred ninety-six dollars ($1,296).

The court allowed the association to retain the money paid and earned upon the stock, and the money paid upon interest and other charges made by the association, and rendered judgment against the bank and the other defendants in error for $750. This is even more than is due the plaintiff in error. But the bank, desirous of avoiding litigation and to save costs and expenses, tendered said sum, though it exceeded the amount due. We insist that this is a contract for the loan and payment of money with interest at six per cent per annum, and not at "12.29 per cent per annum." (Fidelity Sav. Assn. v. Shea, 55 Pac., 1022.)

In this case Mrs. Wrighter has continued to pay the plaintiff in error for five years, and in that time she has paid fourteen hundred seventy-eight dollars ($1,478) on a loan of fifteen hundred dollars ($1,500), and, according to the contention of the plaintiff in error, she has reduced her loan two hundred dollars ($200), in round numbers. Paying at this rate, she would continue to pay to the plaintiff in error during a term of about thirty-five years before she

would complete the payment of her loan, and in that time she would pay to this association many thousands of dollars, yet the plaintiff in error comes into a court of equity and asks the court to enforce, under the principles of equity jurisprudence, such an outrageous contract. The whole contention of the brief of the counsel of the plaintiff in error is that *it is a contract*—that it is "nominated in the bond," that it matters not what the terms of the agreement are or whether its results are inequitable or not, that it *must be kept* by the unwary borrower, including premiums and penalties and commissions and all the other subterfuges that the ingenious agents of this association have attached to the real contract of the parties.

The plaintiff in error in its brief seeks to shield itself under the proposition that there was no usury law in the State of Wyoming at the time of the execution of this note and mortgage and other contracts, and it leaves the impression that, because there was no usury law at that time, that any character of contract, the most unjust, is beyond the reach of the court of equity, a principle to which we do not subscribe, and we believe that the courts of equity, when these contracts are brought before them, will do justice between the parties. The contracts of building associations have been construed by many of the courts of this country and relief has been granted upon every ground that could be reached by the courts against these unjust and inequitable character of contracts.

And in all states where usury laws are in force the courts draw these contracts within the provisions and spirit of these laws and have compelled the associations to surrender the "pound of flesh." The courts of Iowa, Kentucky, Maryland, Nebraska, New York, North Carolina, Pennsylvania, South Carolina, Texas, West Virginia and Connecticut have so held this character of contract. (4 Ency. L. (2d Ed.), 1056.)

In other cases the courts have held that the premium paid for the privilege of borrowing is merely a disguise for un-

lawful interest, etc.  (Assn. v. Abbott, 85 Tex., 220; Ewing v. Savings Assn., 43 O. St., 31; Bldg. Assn. v. Mayers, 25 S. W., 1132; Stevens v. Assn., 51 Pac., 779; Assn. v. Graham, 7 Neb., 173; Assn. v. Bierney, 25 S. W., 622; Mills v. Assn., 75 N. C., 292; Assn. v. Blackburn, 48 Ia., 385.; Houser v. Assn., 41 Pa. St.; Citizens' Savings Co. v. Uler, 48 Md., 455; Assn. v. Logan, 66 Fed., 827; Assn. v. Harris, 32 S. W.)

The right of the bank to redeem from this mortgage cannot be questioned in equity.  (4 Ency. L. (2d Ed.), 1075.) The amount necessary to redeem is what would be due on foreclosure under the terms of the note and mort-- gage.  (Id.)

Potter, Justice.

The Bank of Commerce, a corporation organized under the laws of this State, brought this suit against The Fidelity Savings Association, a corporation organized under the laws of the State of Colorado, to redeem from a mortgage held by the defendant upon certain real estate in Sheridan County, in this State, which property had been conveyed to the plaintiff by Anna L. Wrighter and William D. Wrighter, the mortgagors.  Prior to the suit plaintiff had tendered to defendant, in payment of the indebtedness secured by the mortgage, the sum of $750, and demanded a discharge of the indebtedness and release of the mortgage, which tender was refused.  Upon the filing of an answer and cross-petition praying for the foreclosure of the mortgage, the debtors, Anna L. Wrighter and William D. Wrighter, were ordered to be brought in as parties to the action, and service was obtained upon them by publication, they having become non-residents of the State.  They did not appear, and were adjudged to be in default.

It appears that the defendant below, plaintiff in error here, was originally incorporated in 1889 under the laws of Colorado by the name of "The Fidelity Building and Loan Association."  The objects of the association, as re-

cited in its certificate of incorporation, were "for the purpose of assisting its members in saving and investing their money by issuing to them the stock of this association and receiving payment therefor in full or in installments in such manner as may be provided by the by-laws, and loaning them the funds thus accumulated for the purpose of buying, building upon and otherwise improving real estate, or for other purposes; such loans to be secured by a trust deed, or mortgage, which shall be a first lien upon real estate or upon the stock of the borrowing members, or upon both, as the case may be." The capital stock was fixed at two million dollars, to be divided into twenty thousand shares of one hundred dollars each. The principal place of business was stated to be the City of Denver, in the State of Colorado.

In 1896 certain amendments to the certificate of incorporation were filed. The name was changed to that of "The Fidelity Savings Association;" and the objects were amended to read as follows: "The objects for which our said association is formed and incorporated are for the accumulation and loan of funds for the purpose of assisting shareholders in saving and investing their money on the plan of issuing to them shares of the capital stock of this association, and permitting such shareholders to pay therefor in full at the time of purchase thereof, or by permitting payments therefor in part or in installments at such times and in such manner and on such plan as to the payment, and as to the plan and extent to which said shares shall participate in the profits of the association, as shall be provided in the by-laws of the association and in the certificate for such shares of stock, as issued by our said association; our said association shall have the power to purchase, lease, sell and convey real estate, to receive money on loan or deposit, to borrow money on long time or on short time, to lend money to its shareholders on the basis of first liens upon real estate, or upon the shares of the capital stock of the association, or upon either or both of such securities, or upon such other securities as by the by-laws provided or by

the Board of Directors determined; and do all other things authorized to be done by corporations known as building and loan associations; and also to do all things and possess all other powers and privileges as may hereafter be authorized by law." The capital stock was increased to ten million dollars, each share being of the par value of one hundred dollars.

From certain sections of the statutes of the State of Colorado introduced in evidence, it appears that it was provided by the laws of that state as follows: "That all associations organized under the general incorporation laws of this state, for the purpose of accumulation and loan of funds, the erection of buildings, the acquiring of homes, and the purchase, lease and sale of real estate for the mutual benefit of its members, shall be permitted to conduct such business with its members, exclusively, and may receive money in payment for its shares of stock in such manner and upon such terms as are prescribed by its by-laws; may receive money on loan or on deposit, and may lend money to its members upon the stock of such corporation, upon real estate or upon such other security as by the by-laws provided, or by the Board of Directors determined; and all contracts between such companies and their members shall be deemed valid and binding in law." (Mills Anno. Stat. Colo., Sec. 279.)

The next succeeding section of the Colorado statutes (Sec. 280) provided that the shares of stock of such a corporation shall not be more than two hundred dollars each, installments of which stock shall be paid at such time and at such place as the by-laws shall appoint; "every share of stock shall be subject to a lien for the payment of unpaid installments and other charges incurred thereon under the provisions of the charter and by-laws, and the by-laws may prescribe the form and manner of enforcing such lien. New shares of stock may be issued in lieu of the shares withdrawn or forfeited; the stock may be issued in one or successive series, in such amounts as the articles of incorpora-

tion or the Board of Directors may determine, and any shareholder wishing to withdraw from said corporation shall have power to do so by giving thirty days' notice of his or her intention to withdraw, when he or she shall be entitled to receive the amount provided by the by-laws or determined by the Board of Directors, less all fines and other charges; *Provided,* That at no time shall more than one-half of the funds in the treasury of the corporation be applicable to the demands of withdrawing shareholders, without the consent of the Board of Directors, and that no shareholder shall be entitled to withdraw whose stock is held in pledge for security."

Provision is made for the liquidation of the stock of deceased shareholders (Sec. 281); and by Section 282 it is provided that "shares of stock upon which a loan has been made may be paid in full by the borrower in such manner and upon such terms as provided in the by-laws; and when so paid, such share or shares of stock may be cancelled and such indebtedness liquidated, to the amount in value of said share or shares of stock so paid."

Section 2253 of the Colorado statutes, on the subject of interest, was also introduced in evidence, viz: "The parties to any bond, bill or promissory note, or other instrument of writing, may stipulate therein for the payment of a greater or higher rate of interest than eight per centum per annum, and any such stipulation may be enforced in any court of competent jurisdiction in the state."

The by-laws of the association were put in evidence, and from them we find the following provisions among others:

"ARTICLE I.

"SECTION 1. Any person, male or female, may become a member of The Fidelity Building and Loan Association by subscribing for, or in any manner becoming the legal holder of one or more of the shares of stock issued by the association.

"SEC. 2. Every stockholder shall enjoy all the rights and privileges of membership for and during the period such share or shares shall remain in force.

"article ii.

"Section 1.  *Monthly Payment Stocks.*  The Board of Directors may, from time to time, provide by resolution for the issue of such monthly payments and other shares to be paid for in regular periodical installments as they shall find best intended to advance the interests of the association. All certificates for shares of stock issued under the provisions of this section shall contain a brief statement of the terms of issue and of the withdrawal value at any time before, as well as at the period of maturity.  All such stock shall be deemed fully matured when the credits thereto, with earnings added, shall equal the face value of the stock.

"Sec. 3.  *Stock Assigned.*  Any member may sell and assign the shares, subject to the lien of the association for any balances or charges due, on the form furnished by the association therefor, by returning the certificate to the association for transfer upon the books of the association, and paying a transfer fee of $1.00 for each certificate.  *Provided,* That the borrowers can only transfer their stock to a purchaser of the real estate securing the loan, and *Provided, further,* That no transfer will be valid unless made on the books of the association.

"Sec. 5.  *Fines.*  Should any member fail to make the monthly payments on stock held by him for any month prior to the tenth day of month after due, such member shall be fined ten cents for each share in arrears, and the same for every month thereafter during such delinquency.  *Provided,* That all stock shall be subject to a lien for the payment of unpaid fines, and the same may at any time be charged off against the stock and deducted from the credits thereon.

"article iv.

"Sec. 2.  *Dividends.*  All the earnings of the association, after paying interest, losses, if any, in excess of contingent fund, and the guaranteed dividends on non-participating stock, shall be distributed among and credited to the several

classes of participating stock, giving to each share its proportionate amount of the profits earned, taking into account the amount earned and standing to the credit of such stock, and the time the association has had the use of the money.

"Sec. 3. *Contingent Fund.* This fund shall consist of such money as may be set aside therefor out of the expense fund; of all advance cash premiums charged on loans, and an amount not to exceed one per cent per annum of the amount of loans outstanding, as shall be set aside by the Board of Directors as a contingent fund, to be used to pay losses, if any, and such bills, costs, damages or liabilities for which the other funds of the association shall be inadequate or make no provision.

"Sec. 4. *Expense Limited.* The expense fund shall consist of all fees charged by the association and an amount equal to one and one-fifth per cent per annum on the par value of all prepaid and installment shares paying sixty-five cents or more per share, and of one per cent of the par value of all monthly payment stock paying a less sum per month per share. Which annual expense shall be charged in such manner that each share will contribute pro rata.

"ARTICLE V.

"SECTION 1. *Real Estate Loans.* All money in the loan fund shall be loaned under the supervision of the Board of Directors to those members offering ample real estate security. No loan shall be made to exceed 50 per cent of the value of the security offered. Every member obtaining a loan shall hold and assign to the association at least one share for every $100 of the loan granted, and shall be required to make the regular payments thereon promptly as the same become due, which stock shall be held as collateral security until the loan is paid. The maturity of such stock shall cancel the loan and the excess of stock held by the member, if any, shall be paid to the holder of the certificate. The rate of interest shall be six per cent per annum. Each borrower shall also pay a monthly premium in such amount as the note and mortgage or trust deed shall provide. The

minimum rate of premium and the premium plan may from time to time be established by the Board of Directors. Interest and premium shall be due and payable monthly in advance at the home office of association, on or before the last day of each month, from the date of the loan until fully paid. Loans shall be made in the order the applications are filed with the Secretary, provided that the security is sufficient. No loan shall be made unless approved by a majority of the Board of Directors.

"Sec. 3. The borrower shall comply with all rules and regulations required by the Board of· Directors and pay the expenses of making the loan, furnish an abstract of title showing the lien of the association to be the first and best lien against the property, together with the certificate of the attorney of the local board, showing search of record and the condition of the title. The member shall pay all recording fees and other necessary expenses of closing the loan, together with a fee of $5.00 on every loan less than $500, or of $10.00 on every loan of $500 or more, for each abstract examined, to cover cost of preparing papers and examining title at the home office. *Provided,* That the Board of Directors may from time to time provide that an advance cash premium in such an amount as they shall elect may be charged on all loans and paid into the contingent fund.

"Sec. 5. *Loan Fines.* Should a borrowing member fail to meet the payments of interest or premium, a fine shall be charged of ten cents for every $100 borrowed per month, for each month during delinquency.

"Sec. 6. *Stock Assigned.* No borrowing member shall be permitted to withdraw the shares assigned as collateral to the loan until the loan or advance shall have been repaid to the association. Borrowers can only assign the shares held by the association as collateral, to a purchaser of such shares and of the property securing the debt due the association, and no such assignment of stock shall be accepted by the association until the assignee shall have agreed to assume and pay such indebtedness on the form furnished by the association.

"SEC. 7. *Foreclosures.* The Board of Directors may at any time after a loan has been in default for one month for non-payment of the interest or premium, fines or dues, direct the attorney to at once commence proceedings for the collection of the debt and foreclosure of the mortgage or trust deed securing the same.

"ARTICLE X.

"SEC. 6. The certificates and terms and conditions of shares of this association, the by-laws and applications for membership, with the resolution of the Board of Directors providing the terms of any stock issue, shall form the contract. *Provided, further,* That. all executed papers connected with any loan form a part of the contract.

"SEC. 7. In case of the neglect of any borrower to insure the improvements on property or pay taxes on realty pledged to this association as security for advances, the Secretary may withdraw from the funds standing to the credit of the shares transferred as security a sum sufficient to cover such insurance or taxes and the expense of paying the same.

"SEC. 8. Payments to the association shall be applied first to pay fines, interest, premiums, losses and other charges past due, if any; next, to the payment of dues on stock; and, lastly, as advance payments."

August 24, 1894, William D. Wrighter of Sheridan, in this State, became the owner of fifteen shares of monthly payment stock of said defendant association, evidenced by a certificate of that date numbered 9446. The certificate stated that said Wrighter was the holder of the said number of shares, and a member of said association. Under the date of September 21, 1894, said Wrighter, by a writing upon the certificate, or on the back thereof, assigned and transferred all his right, title and interest in said shares unto Anna L. Wrighter. A certificate dated August 24, 1894, was issued for the same number of shares to said Anna L. Wrighter, and that certificate bore the same number as the original certificate to W. D. Wrighter. There

can be no doubt under the evidence that this certificate was issued in place of and as a substitute for the certificate issued to W. D. Wrighter and for the same shares; and, although the assignment was not actually made according to its date until September 21, the new certificate was given the same date as the one assigned. The assistant manager of the defendant association testified that an application in writing for the shares was originally made by W. D. Wrighter, and it was admitted in evidence as defendant's exhibit "No. 4," but it is not incorporated in the record, doubtless through some inadvertence. The same witness testified that the application was accepted, and a certificate issued in regular form. That certificate was admitted in evidence and is in the record. He further testified that said certificate was subsequently transferred to Anna L. Wrighter, and that a new certificate for the same stock was issued to said assignee, and that document was also admitted in evidence.

Each certificate of stock contained stipulations pursuant to the by-laws. The shareholder agreed to pay the association fifty cents per month on every one hundred dollars of the face value of the certificate (the face value being $1,500), commencing with the month after the date of the certificate; and it was provided that whenever the payments aggregated forty-five dollars per share no further payments need be made, except, however, that the regular monthly payments were required until maturity, if the shares should be pledged as collateral to a loan, unless waived by the Board of Directors at a regular meeting. This provision doubtless had reference to a by-law provision as to prepaid stock; but it is immaterial to this controversy, since the shares were pledged. It was further provided on the face of the certificate that a failure to make payments when due would subject the stock to a fine of ten cents per share each month during delinquency; that the shares could be withdrawn by paying a reserve fee of $2.50 per share at any time on thirty days' notice, whereupon the holder would

receive all money paid on the stock (except fines) with six per cent interest if withdrawn within three years, or with seven per cent interest if withdrawn within five years, or with eight per cent interest if withdrawn thereafter before the period of maturity, and at maturity with full profits earned and standing to the credit of the stock. It was, however, provided that only one-half of the receipts of the association for any month could be used to pay withdrawals without the consent of the directors.

It was also stipulated on the face of the certificate that the stock might be transferred at any time by returning the certificate to the home office for transfer on the books of the association, and in no other manner; and that the certificate giving the terms and conditions of the shares, the by-laws and the application for membership constitute the contract, and that all executed papers connected with any loan form part of the contract.

August 27, 1894, the said Anna L. Wrighter subscribed and made oath to a paper entitled, "Application for City Real Estate Loan." In that instrument she applied to the defendant association for a loan of fifteen hundred dollars, as a member of the association, to be payable in monthly installments and bear interest and premiums as provided by the rules and by-laws of the association. As security she agreed to assign fifteen shares of stock in the association, and deliver the certificate to the association to be held as collateral to the loan; and also to give a first mortgage or trust deed, in satisfactory form, on certain real estate therein described, which was represented as occupied by the applicant and used as a residence.

It appears from the evidence that the application was accepted, and Mrs. Wrighter received $1,500 from the association, and on September 26, 1894, she and her husband, William D. Wrighter, executed and delivered to defendant association a promissory note or contract as follows:

"$1,500.00        Denver, Colorado, Sept. 26th, 1894.

"On or before ten years after date we promise to pay to The Fidelity Building and Loan Association, at its principal office in Denver, Colorado, the sum of fifteen hundred dollars, with interest thereon at the rate of six per cent per annum; together with a monthly premium on said sum of sixty cents on every hundred dollars thereof; interest and premium being payable monthly on the last day of each and every month until this note is fully paid.

"This note is given in consideration of a loan made by the payee to the maker hereof, who is a member of said association and the holder of 15 (M. P.) shares of stock in said association, evidenced by certificate No. 9446, which are hereby assigned as collateral to the said loan.

"Now, Therefore, The maker hereof covenants and agrees to pay the interest and premium upon said sum, and the monthly payments upon said shares promptly, as the same becomes due and payable, in installments of not less than twenty-four (.24.00) dollars per month, payable in advance on the first day of every month, commencing with date and hereafter, until at the maturity of said shares the proceeds thereof shall be applied to repay the loan.

"If any interest or premium, evidenced by this note, or monthly payment upon the shares herein described, shall remain unpaid for sixty days after the same becomes due and payable, then the principal sum, as evidenced hereby, may at once, without notice, become due and payable at the option of said association.

"And if any payment evidenced hereby is not paid when due, fines shall be added as provided by the by-laws of · The Fidelity Building and Loan Association, aforesaid, together with all costs of collection, including an attorney's fee of ten per cent, if collected by an attorney foreclosure proceedings, or by suit at law.

"(Signed)              Anna L. Wrighter,
                       William D. Wrighter."

On the same date said parties executed to the defendant association a mortgage covering the premises in contro- versy.

The mortgage contains a provision authorizing foreclosure at public sale in case of default; and out of the proceeds the association is authorized to retain the principal, premium and interest, costs and expenses of sale, and an attorney fee of one hundred dollars; and said attorney fee, it is provided, shall be taxed as costs in any proceeding in equity to foreclose the mortgage.

The cause was tried to the court in February, 1901, and a decree was entered March 11, 1901, by which the court found upon the facts substantially as follows: That Anna L. Wrighter was the owner in fee simple of the real estate in question on September 26, 1894; and that she with William D. Wrighter on that date made, executed and delivered to the defendant association the note and mortgage aforesaid. That prior thereto said Anna L. Wrighter made application to the association for a loan; and that the entire contract in evidence between her and the association was solely a contract of loan, and that thereby the association agree to loan said money to her at the rate of six per cent per annum. That the association pretended to issue to her fifteen shares of stock, but that they were solely the means to secure the loan; and that the said stock was at all times in the possession of the association, and was never delivered to her, and was at all times the property of the association; and that the premium bid was for the sole purpose of securing the loan. That prior to the loan William D. Wrighter had applied for membership in the association and obtained a certificate for fifteen shares of stock, which was assigned by him to his wife, and a new certificate issued in her name; said stock providing for the payment of fifty cents per share, in addition to payments of interest and premium, making a total monthly payment of $24. That the aggregate of all payments made by said Anna L. Wrighter prior to August 15, 1899, was $1,478.30.

That said loan, with interest at six per cent per annum to date of decree, amounts to $2,085, to which should be added $14 paid by the association for insurance, and as interest thereon $2.30. That the plaintiff, the Bank of Commerce, purchased the property from said Anna L. Wrighter and husband February 20, 1900, and has since been the owner of the same. The fact of tender of $750 April 19, 1900, is found, and also that before the introduction of any evidence in the case the plaintiff tendered $1,200, and offered to pay all costs up to that time in full settlement, and the delivery to the plaintiff of the stock pretended to be issued, which tender was refused. That the stock so held by the association and belonging to it is of the value of $540, and that the $750 tendered exceeds the sum actually due to the defendant.

As conclusions of law the court found that the application for loan, issuance of stock, premium and interest constitute a transaction of loaning money; that Anna L. and William D. Wrighter are entitled to credit for all payments made by them, either as so-called stock payments, premium or interest, allowing the association six per cent per annum interest on said loan; and that credit should be given for interest on monthly payments, except on the interest payments, for the average time the same have been paid.; that the claims advanced by the association are unconscionable and inequitable; that the plaintiff is entitled to redeem from the mortgage lien, and, having tendered $750, the association is entitled to judgment against plaintiff for that sum, and is entitled to retain the stock and its value of $540. Judgment was thereupon rendered in favor of the association for said sum of $750 against the bank, said sum having been deposited in court; and the association was authorized to receive it upon receipting in full in discharge of the judgment. It was further ordered that upon failure of the association to accept the said sum and satisfy the judgment and discharge the mortgage, the clerk of court should as special master release the mortgage,

and the decree should stand as a full satisfaction of the judgment.

Exceptions were reserved to the findings both of law and fact and to the decree, and the case is brought here by the association on error.

On the trial of the case two witnesses only were examined. B. F. Perkins, president of the plaintiff bank, testified in behalf of the plaintiff, and Charles T. Springer, assistant manager of the defendant association, testified in its behalf. The testimony of Mr. Perkins was largely confined to proof of the ownership of the premises by the plaintiff and the making of the tender of $750 in April, 1900. He testified that, although the deed conveying the property to the bank bears date February 20, 1900, it was not delivered until some time in April. The deed contains the following covenant among others: "and that they (the premises) are free from all incumbrances whatsoever, except a mortgage of $1,500 to The Fidelity Savings Association of Denver, Colorado, on which about one-half ($\frac{1}{2}$) of the principal has been paid." The association was not a party to that deed. The witness stated in regard to the tender that shortly after the delivery of the deed he authorized a bank in Denver to make a legal tender to the association of $750, being the balance of the principal of the loan, as he understood from the deed, and that the tender was rejected. He also stated that prior to the conveyance to the bank there had been paid on the mortgage $1,478.30, but it appeared that his testimony on that subject was merely his understanding based upon what the representative of the association had said; and he admitted on cross-examination that he understood said amount to be the total sum paid, and would not say that the representative had declared the entire amount to have been paid on the mortgage. It clearly appeared that as to payments he did not testify nor claim to do so from personal knowledge.

The bill of exceptions contains the following statement concerning the tender made in court before the introduction of evidence:

"The plaintiff bank tenders the sum of $1,200 to The Fidelity Savings Association and offers to pay the costs of the action, but not including attorney's fees, which tender is refused by the defendant association."

Mr. Springer, testifying as a witness for the defendant, identified the various documents introduced in evidence for the defense, and testified that Mr. Wrighter had applied for membership; that a certificate of stock for fifteen shares was issued to him; that the same was by him assigned to his wife, and a new certificate for the same shares issued to her; that she afterwards applied for a loan, and that the same was made in the sum of $1,500, for which the note and mortgage aforesaid were taken; that the last payment thereon had been made December 11, 1899, for the month of July, 1899; that of the monthly payments required, $7.50 was applied to stock dues, $7.50 to interest and $9.00 to premium; that there had been $450 paid on account of stock and $975 as interest and premium; that none of the principal debt had been paid; and that there was due on the note $1,869.70, which amount was arrived at by the following computation:  Original loan, $1,500; insurance paid, $14; interest on insurance payment, $2.30; interest and premium unpaid for eighteen months from and including August, 1899, to and including January, 1901, $297; balance of fines against the loan, $56.40. The witness further testified that the withdrawal value of the stock was $472.50, which credited on the note would leave a balance due of $1,397.20. The value of the stock was arrived at by the witness as follows: The dues paid, $450; interest thereon at eight per cent per annum up to December 11, 1899, date of last payment, $90; interest on $450 from December 11, 1899, $42, making total interest on stock payments, $132. Deducting fines, $72, and a reserve of $2.50 per share shows the balance $472.50.

On cross-examination, the witness testified that the actual objects of the association were not changed by the amendments to its articles of incorporation, but that it was a

building and loan association; that it received subscriptions to its stock and reloaned the money to members; and no one could become a borrower who was not a member; that Wrighter agreed to pay on the loan a premium of sixty cents a month on each $100 borrowed, amounting to $9 per month, and $7.50 per month interest, aggregating $198 each year; and that there had been paid for all purposes, on stock, loan and fines, $1,478.30. It appeared in his direct examination that of the $72 loan fines, $15.60 had been paid. The witness further testified that the stock was assigned as collateral. It appeared that the dividends earned on the stock up to the time payments ceased amounted to $84.75.

With reference to the nature of the transaction, premium, etc., the witness testified, on cross-examination, that the premium is the amount which a borrower in a loan association is willing to bid for the present use or possession of the value of his shares; that he is not required to pay the premium for the use of the money, but that the association gives him the full value of his stock at once, although it may be ten or twelve years before he would otherwise be entitled to receive it; and he is willing to offset against his dividend certain payments for the privilege of getting the use of the money; that if the shareholder does not carry his stock through to the end he receives interest upon surrender instead of dividend. It appeared further from the testimony of this witness that the premium bid in this case was the minimum premium at that time. The witness admitted on cross-examination that the interest and premium is paid for the use of the money, less dividends on the stock. Interest was paid sixty months, but not always promptly as required.

It further appeared that the payments amounting to $1,478.30 had been applied as follows: To dues, $450; fines, $15.60; commission items, $30; insurance, $7, and interest and premium, $975.70. The insurance payment credited is explained in this manner: The association paid

$21 insurance and the debtor subsequently repaid $7 on that account.

There is no conflict in the evidence; and as we are unable to agree with the trial court in some of the findings of fact, we think it proper in the first place to state our views in relation to them. The finding that the certificate of stock issued in the name of Mrs. Wrighter was never delivered to her, and that its issuance was a mere pretense, is not supported by the evidence. No witness so testified directly or indirectly, nor does the evidence furnish any ground for questioning the genuineness of that transaction. It is clear and undisputed that Mr. Wrighter applied for and received a certificate for fifteen shares, and that he assigned the same to his wife, which assignment was recognized and accepted by the association; whereupon she clearly became the owner of those shares. It is further conclusively shown that a new certificate bearing a like number was issued to her for the same shares; and she recited the fact of her ownership of the shares, and her membership in the association, in her written application for the loan, as well as in the note signed by her; and she is not now denying that the certificate was issued and delivered to her. Moreover, the plaintiff bank, in its petition in this case, alleges that the "mortgagors duly assigned to said defendant a certificate of the shares of stock of the defendant association No. 9446 to the said defendant as collateral security for said loan of $1,500;" and further that said mortgagors "duly transferred to the plaintiff the interest the said Anna L. Wrighter and William D. Wrighter possess in said certificate of stock in said defendant association," and that the plaintiff is ready and willing "to surrender to the said defendant said certificate of stock of said defendant association, so held as collateral by said defendant."

These admissions of plaintiff's pleading are in no manner qualified by the evidence; and it is apparent that the plaintiff understood that Mrs. Wrighter was the owner of the shares and that they were held by the defendant asso-

ciation as collateral security under assignment for that purpose.

The court further found that the association agreed to loan the money at the rate of six per cent interest per annum. So far as the use of the word "interest" is concerned, that is true. But the payment of six per cent interest was not by any means the sole consideration for the loan; and the finding is not supported by the evidence, if it intended to cover the entire contract. In her application Mrs. Wrighter agreed not only to pay interest, but also premium as provided by the rules and by-laws of the association; and the note contains a promise to pay not only interest at the rate of six per cent per annum, but also a monthly premium of sixty cents on every hundred dollars of the loan, and to pay interest and premium monthly; and that agreement is in terms referred to in the mortgage. There is absolutely nothing in the evidence to show or even tending to show that the contract does not accurately express the agreement of the parties, nor is there the slightest indication in the evidence, nor any claim, of fraud, deceit or misrepresentation. The contract is plain and unambiguous, and no attempt was made to dispute the agreement contained in the note or contract.

Whether the contract ought to be enforced according to its terms is a question that awaits consideration. But upon the evidence it is an undisputed fact that the mortgagors agreed to pay the principal debt, interest and premium, provided in the note and mortgage. So far as the record discloses, the debtors are not in any way complaining of the transaction.

Again, we are unable to find support in the evidence for the finding that the shares of stock were issued solely as a means to secure the loan. It might be inferred possibly that Mrs. Wrighter took an assignment of her husband's shares for the purpose of applying for and obtaining a loan; but there is no evidence to that effect, and we do not understand how it can be said, upon the evidence, that

the shares would not have been taken or subscribed for had a loan not been contemplated by both parties. Certainly nothing is disclosed to show that when Wrighter subscribed for the shares he anticipated making a loan either immediately or at any time. Whatever transpired in the way of oral negotiations between the parties is not disclosed. While we think the finding not sustained by the evidence, we are not to be understood as holding that the rights of the parties would have been affected had it appeared that Mrs. Wrighter subscribed for the shares for the purpose solely of qualifying herself to negotiate a loan with the association.

The District Court, in effect, credited all payments of premium upon the principal debt, and allowed the creditor for the use of the money merely the interest at the agreed rate of six per cent per annum, and disregarded the contract of the parties in every other particular. It is evident, therefore, in view of the facts, that, unless some legal or equitable principle should intervene to prevent the enforcement of the contract made by the parties, the judgment must be reversed as erroneous.

There are a multitude of decisions emanating from the courts of the different states covering a great variety of questions growing out of loaning transactions of building and loan associations, and in respect to many, if not all of such questions, there is more or less conflict of authority. It is impracticable without unduly extending this opinion to fully review the authorities, nor do we deem it necessary, since in a majority of cases the determination has been based upon peculiar statutory provisions. It may be said generally that by the clear weight of authority the exaction of a premium from a member in consideration of the privilege of receiving the par value of his stock in advance of its maturity as a loan or as an advance, however the transaction is considered, is upheld, at least when the statute authorizes it, and such a transaction is more usually held not to be usurious when the provisions of the statute have

been complied with. As the question of usury does not enter into this case, it is not necessary to consider those cases where the only or chief question involved was whether or not the contract was usurious.

It is clear that the contract was not usurious under the laws of Colorado, and indeed it is not suggested that the contract violated the usury laws of that state or of this State. There was no usury statute in this State until the act of February 11, 1895, adopted after the making of the contract here involved. When the note and mortgage in question were executed, the statutes of this State on the subject of interest provided that any rate of interest agreed upon between parties, for the loan or forbearance of money, goods or things in action, shall be valid, provided that if such agreement be for a higher rate of interest than twelve per cent per annum, the same shall be in writing. (R. S. 1887, Sec. 1310.) And the legal rate of interest, in the absence of contract, was twelve per cent per annum. (Id., Secs. 1311, 1316.) Hence, irrespective of the nature of the premium agreed to be paid to the association, but treating it as an extra interest charge for the use of the money, it is evident that it cannot be held invalid, in the absence of fraud, deceit or misrepresentation, or some equitable reason rendering it oppressive and unjust.

The premium demanded and received by a building association is defined by Endlich as follows: "The premium is a bonus charged to a stockholder wishing to borrow, for the privilege of anticipating the ultimate value of his stock, by obtaining the immediate use of the money his stock will be worth at the winding up." (Endlich on Building Associations, Sec. 399.) And in American and English Encyclopedia of Law, the premium is said to be the amount charged a stockholder for the privilege of receiving a loan, or the conventual difference between the par value and the present real value of stock. (Vol. 4, p. 1067.) The various definitions of the term, although differing slightly in language, seem substantially to agree. (See 6 Cyc., 147,

and cases cited.) And the definitions given above fairly state the generally recognized character and purpose of the charge known as "premium." Various methods are employed in taking the premium and determining the amount, depending upon the rules or by-laws of the particular association, or the statutory regulations under which it operates. And where the statute permits a premium to be charged or fixed in a certain manner, it has been held in a number of cases that if the statutory plan be not followed, the contract will be usurious provided the premium added to the regular interest charge exceeds the rate of interest allowed by law. One method is known as the gross premium plan, whereby an amount or a certain percentage determined on is deducted from the par value of the stock at the time of the loan, and the difference or balance is handed over to the borrower. This amount so deducted is often determined by receiving bids from various members who are desirous of anticipating the value of their stock by borrowing from the association some of its funds on hand. Another method is that where the borrower agrees to pay periodically a sum or percentage in addition to interest and the dues on his stock; and this is called the installment premium plan, and is that adopted by the parties in the case at bar. It may be conceded for the purposes of this case, but without deciding the question, that the premium thus agreed to be paid in monthly installments is to be considered as increasing the interest paid for the use of the money. As already indicated, this will not invalidate the contract on the ground of usury under the laws of this State or of the State of Colorado. It is also to be observed that the exaction of a premium was not at the time the contract was entered into a violation of any declared policy of this State. The act of March 7, 1890, in force when this loan was made, governing mutual loan and building associations organized under our laws, authorized them to collect from members stated dues, fines, interest on loans and premiums bid by members for the

right of precedence in taking loans, as the corporation by its by-laws might adopt. (Laws 1890, Ch. 29, Sec. 2.) And by an act of January 10, 1891, provision was made for authorizing such an association organized under the laws of another state or government to do business in this State; and no complaint is made on this record of any violation of, or failure to comply with, that statute on the part of the plaintiff in error here.

But the chief contention in behalf of defendant in error is that the contract is inequitable and unconscionable, and is so oppressive and unjust that a court of equity will not sanction its enforcement. This is the view adopted by the trial court; and that court expressly declared the contract to be inequitable and unconscionable. The conclusion was evidently based upon the theory that the borrower was not in fact a stockholder, but that the shares standing in her name belonged in reality to the association, and that the stock issue was fictitious, and a mere subterfuge, whereby the association was enabled to charge a premium in addition to an agreed rate of interest, and to receive monthly payments on the principal in the way of stock dues without diminishing in the meantime the amount of interest required to be paid monthly; and the court found that the transaction was simply one of loaning money.

We think it quite immaterial whether the transaction consisting of the transfer to Mrs. Wrighter of the sum of fifteen hundred dollars, and her execution of the note and mortgage, and assignment of her certificate of stock as collateral security, is to be considered as a loan of money, or as an advance upon her stock of its par value anticipating its maturity. It may be admitted that so much of the transaction is to be considered as a loan of money. (See Albany Mut. Bldg. Assn. v. City of Laramie, 10 Wyo., 54.) But we are not prepared to yield our assent to the proposition that this constituted the entire transaction between the parties, and that the only relation of Mrs. Wrighter to the association was or is that of a borrower. Where the bor-

rower is the owner of certain shares of stock in the association, although they are assigned to the latter as collateral security for the loan, he sustains a dual relation to the association, viz: that of stockholder and borrower. And this dual relation is generally recognized by the authorities. (Endlich on Building Associations, Secs. 121-125; Thompson on Bldg. Associations, Sec. 167; 4 Ency. L. (2d Ed.), 1057, 1058; 6 Cyc., 126.) We are aware that in a very few states the courts have adopted the theory that the assignment of the member's stock to the association as collateral for the loan or advance made to him operates as an absolute surrender of the same and terminates the relation of stockholder. (Bird v. Kendall, 62 S. C., 178; 40 S. E., 142; White v. Mechanics' Bldg. Fund Assn., 22 Gratt. (Va.), 233; Cason v. Seldner, 77 Va., 297; Overby v. Fayetteville B. Assn., 81 N. C., 56.) But this view is opposed to the great weight of authority; and is not, in our opinion, the logical or reasonable deduction from the contract between the parties. Moreover, it violates the essential feature of the building and loan association scheme, viz: that of perfect mutuality and equality of all the members of the association. Referring to this principle of mutuality, which Mr. Endlich terms the "elementary working principle of the building association scheme," that author says: "It follows, with logical cogency, that whatsoever accommodation any individual member may receive, some equivalent, beyond the mere repayment of money, must by him be returned to the society, and that, in the discharge of his obligation, he is again entitled to his proportionate share, by way of relief, in the advantages which may accrue to the society from other sources. From this self-evident proposition flow all the rights, as well as all the distinctive obligations, of borrowers in building associations, and it at once defines and settles the status of such members in them. For that borrowers necessarily remain members, at least in the sense of continuing entitled to share in the profits of the enterprise, it is impossible, in

practice, to deny, whatever may be the theory held with regard to this subject." (Endlich on Bldg. Assn., Sec. 122.) It is to be observed, moreover, that even in those states, or at least in some of them, where the view is maintained that the relation of stockholder ceases when the member becomes a borrower, he is not released from the obligations contained in his contract of indebtedness to make his regular payments of stock dues; and the writer of a later case in South Carolina than that of Bird v. Kendall, *supra,* while accepting the doctrine of that case, said that he had always inclined to the view mentioned in an earlier case that a borrowing stockholder occupied a dual relation as stockholder and borrower, and that in all settlements between borrowing members and the association, the duties, privileges and liabilities appertaining to each relation should enter into the settlement, and that "this view would necessarily require the borrowing stockholder to comply with the proper rules of the association, pay his proportion of the expenses, bear his part of the losses and receive his share of the profits." (Interstate B. & L. Assn. v. Holland et al. (S. C.), 43 S. E., 978.)

As a necessary result of the principle that a borrowing stockholder continues to be a member of the association, and to be the primary owner of the shares in his name, the prevailing doctrine is that payments of dues upon stock are not *ipso facto* payments upon the debt, and are not to be regarded as partial payments operating as a *pro tanto* reduction of the mortgage debt, so as to periodically reduce the interest agreed to be paid. (Endlich on Bldg. Assn., Secs. 385, 477 et seq.; 4 Ency. L., 1057, 1058; 6 Cyc., 154; Thompson on Bldg. Assn., Sec. 210.) Such payments are, it is true, sooner or later to be used toward the extinguishment of the debt, or to state the rule with greater accuracy, the borrower is entitled to a credit upon his indebtedness of the value of his shares whenever he undertakes to redeem from the mortgage, to be determined according to the reasonable rules and by-laws of the association; and

ordinarily the understanding and contract, as well as the expectation, is that the stock payments, with accumulated profits, will cause the stock ultimately to mature and equal in value the amount of the indebtedness, whereupon the former will be appropriated by the association and the debt become extinguished.

We are aware that on this question also the authorities are not harmonious, and that some courts refuse not only to recognize the dual relation sustained by the borrowing member to the association, but regard the issuance of stock as a mere fiction, and as a subterfuge adopted in an attempt to evade the usury laws, and treat not only the premium, but also the stock dues as a payment upon the debt, and in a few cases the enforcement of particular contracts has been denied on the ground that they were oppressive and unconscionable. In most of such cases the dues, as well as premium, have been regarded as merely an expedient to collect exorbitant interest. (Mills v. Salisbury B. & L. Assn., 75 N. C., 292; Howells v. Pacific States Sav. L. & B. Co. (Utah), 60 Pac., 1025; People's B. L. & Sav. Assn. v. Fowble (Utah), 53 Pac., 999; Sawtelle v. North Am. Sav. L. & B. Co., 14 Utah, 443; 48 Pac,. 211; Fidelity Sav. Assn. v. Shea (Idaho), 55 Pac., 1022; Pacific States L. & B. Co. v. Hill (Ore.), 56 L. R. A., 163; Hale v. Stenger, 22 Wash., 516; U. S. Sav. & L. Co. v. Parr, 26 Wash., 790.) In a majority of these cases the borrower paid at the outset a premium of fifty per cent of the loan; receiving in money one-half of the amount of his note and mortgage, assigning to the association absolutely one-half of his shares, and agreeing to pay thereon the regular stock dues; and there does not seem to have been any showing of specific fraud, deceit, mistake or misrepresentation. The same conclusion was reached in the Federal Court for the District of Oregon in the case of Pacific States Sav. L. & B. Co. v. Green, 114 Fed., 412. But the judgment was reversed in the Circuit Court of Appeals (123 Fed., 43), and that court, in referring to the theory of the trial court

·that the transaction was one of loan and nothing else, and that in equity the association can be permitted to receive only its loan and interest, and cannot collect installments or premiums required to be paid in order merely to qualify the debtor to borrow money from the association, said: "This theory has been sustained in some of the decisions in the state courts, cited by appellees, notably in Utah, in Washington and in Oregon (citing the cases). But the objection to it is that the courts, in order to sustain this view, ignore the contract freely and voluntarily entered into by the parties, with full knowledge of all the conditions that might arise if the interest and premiums were not promptly paid, and make a new contract of a different character between the parties." And in the course of the opinion the court said further: "Whether the association offers a good and safe investment to all of its subscribers is a question not here necessary to discuss. Enough has been shown to make it clear that the borrower investigated the business methods of the association, and with full knowledge thereof executed the contract, and, in the absence of any fraud, misrepresentation, deceit, mistake or undue influence, ought to be bound by it, because without such a showing a court of equity ought not to disregard the contract which the parties deliberately made, and make a new contract for them."

In the case of United States Sav. & L. Co. v. Shain, 77 N. W., 1006, the Supreme Court of North Dakota had occasion to consider several questions arising out of a building association contract. The association was a Minnesota corporation. The borrower took a loan of $1,500, agreeing to take thirty shares of stock, and continue the monthly payments thereon until the stock should mature or the loan be paid, and to pay a premium of 50 per cent of said shares, and assign fifteen shares to the association as collateral. It was urged that the contract was usurious and unjust. On that subject the court said: "It is urged by counsel, and has sometimes been held, that every payment on account of stock must be treated as a payment,

*pro tanto,* of the money loaned, and the principal must be reduced by the amount of such payment, and the principal would thus grow less from month to month, until towards the end it would be reduced to a very small sum, and finally to one month's payment; and, as the monthly interest payments remain the same, it is claimed that the rate of interest becomes enormously usurious, amounting towards the close of the term to several hundred per cent, and it is claimed that this makes the contract not only usurious, but so harsh, exacting and unjust that a court of equity should relieve from it. In our judgment, this view entirely excludes the fact that all money that is paid into the treasury of the corporation upon stock installments is, in theory at least, and generally in practice, immediately advanced to other borrowing stock subscribers, at the same rate of interest, and at a large premium, thus tending at once to increase the value of the stock of the member who pays the money into the treasury, or, in other words, hasten the day when payments on account of stock subscriptions can cease. In this manner every member receives a profit upon the money he pays upon stock installments. Now, a man cannot use his money to pay his debts, and yet use it to bring a profit to himself. The two things embody a contradiction. The stockholder in a building and loan association who insists upon having his stock installment payments applied at once in reduction of the amount advanced to him must, in fairness, renounce all claims to share in the profits of the association. But that is contrary to the whole theory and spirit of building and loan associations, and directly opposed to the intentions of all parties who become members. And these remarks suggest another thought, that answers respondent's contention that the payment of the large premium renders the contract harsh and oppressive. If any subscriber suffers unduly in consequence of the premium he pays, it is because his necessities are such that he is willing to pay a larger premium than other subscribers pay. If all subscribers pay the same premium,

and all the money paid in be kept continually loaned, then there can be no hardship, however great the premium may be; and herein we find the causes that operated upon the legislative mind, and induced it to declare that no amount of premium paid should render the contract usurious."

In Cover v. Merc. Mut. B. & L. Assn., 93 Mo. App., 302, it was held, in view of a statute which permitted the collection of premiums by building and loan associations, that a charge of forty cents per hundred dollars as premiums, in addition to interest at the rate of seven and one-fifth per cent, is not so extreme as to be called extortionate or unconscionable, considering the object of such associations and the disposal of the profits thereof for the benefit of the borrowing member.

An interesting and instructive case arose in West Virginia, where an association incorporated under the laws of the State of Michigan was a party, and against whom a decree was sought restraining the sale under mortgage of certain real estate to satisfy the amount claimed to be due upon a loan. The question involved was the right of the association to recover the full amount contracted to be paid. The statutes of West Virginia permitted foreign associations to do business in that state upon compliance with certain statutory provisions, and they were then expressly given the same rights, and made subject to the same regulations and restrictions as similar domestic corporations. Such associations were authorized to charge and collect premiums in addition to interest without being subject to the laws against usury, but the premium was required to be a fixed sum, and as thus fixed it might be made payable in periodical installments or deducted in advance. The by-laws of the Michigan association, however, without basing it on a fixed total amount, provided for a monthly payment of premium until the maturity of the shares, or the repayment of the loan. And the court held that this plan so differed from the scheme allowed by law that it was not excepted from the usury statute. The borrowing share-

holder had paid $220 interest and $240 premium. The court, however, said that while the contract could not be enforced according to its terms, because it did not follow the statutory regulations, it was not so unenforceable because of any want of equity between the borrower and investor, which was perhaps no greater than might occur in an association conforming to the statute, and they set no limit upon the ratio between dues and premiums, from which the inequitable result flows; nor because under the contract the amount due was far beyond the amount borrowed—an inevitable result, the court says, in every building association contract where default continues for a long time; nor because of any improper motives on the part of the association, as there was not a scintilla of evidence of that nature. (Floyd v. National L. & Inv. Co., 54 L. R. A., 536.)

The case of Houser v. Hermann Bldg. Assn., 41 Pa. St., 478, is cited by defendant in error as supporting the judgment in this case. But the decision in that case holding the premium uncollectable was based solely upon a violation of the statutes against usury. Under later statutes authorizing the charging of premiums by building associations such contracts have uniformly been upheld and enforced in Pennsylvania. And in one case the premium enforced was 52 per cent of the loan. There is no support in the Pennsylvania authorities for disregarding the contract, where it is not usurious, nor for holding it unconscionable and inequitable where it is not prohibited by statute. In that state, also, it is well settled that stock payments are not *ipso facto* payments upon the debt. (Watkins v. Building & L. Assn., 97 Pa. St., 514; Link v. Building Assn., 89 Pa. St., 15; Bennett v. Building & L. Assn., 177 Pa. St., 233.)

The Nebraska case of Randall v. National B. L. & Pro. Union, 42 Neb., 809, is occasionally cited as an authority against the validity of these contracts. But it is evident, especially from the more recent decisions in that state, that

the case has been misunderstood. Yet in that case the court apparently approves the doctrine that payment of dues are not *ipso facto* payments upon the mortgage debt, so as to extinguish the same *pro tanto*. In Livingston L. & B. Assn. v. Drummond, 49 Neb., 200, it was held that interest .might be reserved at the highest rate permitted by law on the face of the loan, although a premium was deducted from that amount and the *difference only* paid to the borrower. In People's B. L. L. & Sav. Assn. v. Gilmore (Neb.), 90 N. W., 108, the judgment of the lower court was reversed where the stock feature of the transaction had been disregarded, and all payments had been credited upon the loan as of the date they were made. In that case, and in McDowell v. Pioneer Sav. & L. Co. (Neb.), 90 N. W., 111, where the contract provided for five per cent annual interest and five per cent annual premium, the following rules were laid down for the application of payments made to a foreign association: "(1) .The transaction is to be treated as a loan, and the borrower has the right to have the value of his stock applied to reduce the indebtedness of the mortgage, if he so chooses. (2) Any dividends declared or earned on the stock will inure to the borrower's credit, and this may be credited on the mortgage. (3) The stock is to be taken as worth the amount that has been paid on it, in absence of evidence as to its actual value. (4) Payments made on account of operating expenses and fines belong to the company, and should not be credited on the mortgage. (5) Payments made on the stock are not to be applied as payments on the loan until the borrower has elected to have them so applied, and credit for the value of the stock should be given at the time of such election, and not as of the date when the payments were made. (6) Payments made for premium and interest, if not usurious, are not to be credited on the principal of the mortgage debt."

A Texas case is cited. But the rule enforced in that state is merely that if the interest and premium together exceed the rate of interest allowed by law it is usurious. (Abbott

v. Loan Assn., 86 Tex., 467.)   And in Interstate B. & L.
Assn. v. Goforth, 94 Tex., 259, it was held that the monthly
payments upon shares did not constitute a present payment
of the debt, and that the contract was not *prima facie*
usurious, because, in addition to full legal interest, it pro-
vided for monthly payments upon · the borrower's shares
in the concern, such plan being analogous to that for dis-
charging indebtedness through a sinking fund, and not
invalid unless shown to be a device for evading the usury
laws.

The case of Fidelity Savings Association v. Shea, decided
in Idaho (55 Pac., 1022), is much relied on by counsel for
defendant in error.   It was held in that case that a similar
contract was usurious; that conclusion was reached by not
only adding the interest and premium together, for, as we
understand the case, the sum so found would not have ex-
ceeded the rate authorized by the statutes of Idaho, but the
collection of monthly payments on account of stock dues
without reducing the interest from time to time was held
objectionable, in opposition to the very great weight of
authority on that subject; and the transaction was treated
as though the borrower was not the owner of any shares in
the association.   As already shown, we view the transaction
in a different light.

The authorities are so numerous sustaining contracts of
this character when not in violation of some positive usury
statute that it would be useless to attempt an exhaustive
citation of the cases.   The following are cited as fairly rep-
resenting the prevailing views upon some of the questions
herein discussed:   Bullman v. Citizens' L. & B. Assn.
(Wis.), 90 N. W., 199;  Pac. States Sav. L. & B. Co. v.
Green, 123 Fed., 43;  Post v. Building & L. Assn., 97 Tenn.,
408;  Briggs v. Iowa S. & L. Assn., 114 Ia., 232;  Columbia
B. & L. Assn. v. Junquist, 111 Fed., 645;  Manship v. New
South B. & L. Assn., 110 Fed., 845;  People's B. & L. Assn.
v. Billing, 104 Mich., 186;  Cover v. B. & L. Assn., 93 Mo.
App., 302;  Bedford v. Eastern B. & L. Assn., 181 U. S.,

227; McNamara v. Oakland B. & L. Assn. (Cal.), 63 Pac., 670.

In Manship v. B. & L. Association, *supra,* Judge Niles, in the course of the opinion, says: "Liberty to contract is one of the essential elements of freedom, and one of the most valuable rights incident to our institutions, and it is very difficult for me to see any reason in law or morals why a party desiring to become a member of a building and loan association may not do so, and if he desires that a part of his contributions shall be credited upon the amount borrowed by him, and that a part shall go to swell the loan fund of the association, to be loaned to his fellow-members of the association, and in this way swell the profits and increase the value of his stock therein, and thereby hasten its maturity, I see no reason why he should not be permitted to do so, and why his contract might not be enforced according to his agreement; and, furthermore, I fail to see what right the court, which may be called upon to enforce such contract, has to appropriate his stock payments or his payments of premiums in any other way than he agreed by his contract that they should be appropriated."

We have not specially considered the question whether the contract is to be governed by the laws of Colorado, where the money was by the contract made payable, or by the laws of this State, where enforcement of the contract is sought, because the question has seemed to us to be immaterial since, in the view we take of the case, the contract is not invalid under the laws of either state. It might be said, however, that the general rule is that contracts are to be governed by the law of the place of performance. (Central Trust Co. v. Burton, 74 Wis., 329; Bennett v. B. & L. Assn., 177 Pa. St., 233; Bedford v. Eastern B. & L. Assn., 181 U. S., 227; Manship v. B. & L. Assn., 110 Fed., 845.) We are not here concerned with the question whether the existence of a fraudulent purpose to evade the laws of the forum would alter the principle or render it inapplicable. No such purpose is disclosed in the case at bar, nor did the contract violate the statutes of this State.

It is perfectly clear that, however the transaction is to be considered, it was not invalid as a violation of any statute upon the subject of interest. It remains to be briefly considered whether its terms, upon a proper interpretation thereof, were so oppressive and unjust as to render the contract inequitable and unconscionable. Judge Story, in his work on Equitable Jurisprudence, said that the mere fact that a bargain is a very hard or unreasonable one, is not, generally, sufficient, *per se,* to induce courts of equity to interfere. But the rule laid down by him is that if, upon the whole circumstances, the contract appears to be grossly against conscience, or grossly unreasonable and oppressive, then courts sometimes interfere and grant relief, although they are very cautious of interfering unless upon very strong circumstances. They must be of such a nature as naturally lead to the presumption of fraud, imposition or undue influence. (1 Story's Eq. Jur., Secs. 244, 331; Matthews v. Crockett's Admr., 82 Va., 394; Phillips v. Pullen, 45 N. J. Eq., 5.)

Mrs. Wrighter was a stockholder, as well as a borrower in the association, and it is clear upon both reason and authority that her payments of stock dues cannot be regarded as payments *ipso facto* upon her indebtedness, so as to reduce it *pro tanto,* and permit the claim that she was required to pay interest upon the original indebtedness while it had been largely reduced. Her payments for stock dues, as well as all the payments of all other members into the same fund, assisted to increase the value of her stock, as contemplated by the contract and the rules and by-laws of the association. These payments then cannot be treated in any sense as increasing the amount of interest or compensation agreed to be paid by her for the use of the money loaned.

The premium agreed to be paid may, for the purpose of this discussion, be considered as analogous to interest, and as an additional compensation paid by her for the use of the principal sum. It is to be observed, however, that there is a clear conflict in the authorities as to this matter, and it is not essential that we pass directly upon the question.

Now, the borrower received the face of the loan, viz: $1,500, and agreed to pay interest at the rate of six per cent per annum, amounting to $90 annually, and the further sum of sixty cents per share monthly, amounting annually to the sum of $108, thus making a total annual payment of $198, which amounts to thirteen and one-fifth per cent upon the principal sum. It seems to us, therefore, that the declaration that the contract is inequitable and unconscionable is equivalent to the statement that the exaction of thirteen and one-fifth per cent annual interest upon a loan of money was, in 1894, in this State, so exorbitant and oppressive, and so shocking to the conscience, as to render the transaction presumptive evidence of fraud, imposition or undue influence, and hence so inequitable and unconscionable that a court of equity should refuse to enforce it. A judicial declaration to that effect from this court would hardly be warranted in view of the statute then and for many years in force establishing the legal rate of interest upon contracts not in writing, and upon open accounts and judgments, at twelve per cent per annum, and declaring valid any rate of interest agreed upon in writing in excess of the legal rate. And it is doubtless no exaggeration to say that at the time the contract in question was entered into the rate of interest charged in many sections of this State, upon money loaned in the ordinary manner, as often exceeded the legal rate, and the rate above specified, as otherwise. The courts have frequently enforced contracts made previous to February 11, 1895, calling for higher rates of interest than thirteen and one-fifth per cent per annum, without a suggestion, so far as we are aware, that they were inequitable or unconscionable.

In 1895, after the making of this contract, the Legislature repealed the former statute regulating interest, and placed the legal rate at eight per cent per annum, but provided that any rate might be agreed upon, not exceeding twelve per cent per annum, which might be taken yearly, or for any shorter period, or in advance. (L. 1895, Ch. 30.)

In this discussion we have considered the questions involved as though the borrower was here complaining of the transaction and seeking relief. But that is not the case. The complaining party was not a party to the contracts, and upon the record has not become a party thereto. The bank is the grantee of the mortgaged premises, taking them subject to the mortgage, but it does not appear that it assumed or agreed to pay the mortgage debt so as to render itself personally liable therefor. It seeks to redeem from the mortgage as such grantee, but questions the amount claimed to be due. The general rule seems to be that. the plea of usury is personal to the debtor. Whether that is the rule to be applied under our present statutes, it is unnecessary for us to determine. But many cases holding these contracts usurious where the premium charged is not expressly authorized by statute, refuse to consider such defense in favor of any person other than the debtor. We have not deemed it necessary to inquire into the right of the bank to assail the contracts as inequitable, for the reason that we do not think the contract open to reasonable objection on that ground by the debtors themselves.

Counsel for defendant in error maintains that at the rate this debt has been reduced it would require many years to discharge the indebtedness, but he omits any reference to the fact that for eighteen months no payments had been made, while the interest continued to accumulate; and, according to the contract, fines for the delinquency had been imposed, all of which could have been avoided had payments been continued in compliance with the contract. In any case of a loan of money the debt must be expected to increase rather than diminish if no payments are made upon either interest or principal. Had the debtors not defaulted, but had they promptly met their obligations, the fines would have been absent, the additional sum of $133 would have been paid on the stock, so that the stock value subject to credit upon the debt would have materially increased, and there would have been no unpaid interest or premium.

This disposes of all the material questions except the method of ascertaining the amount due. Before coming directly to that question, we ought to state our conclusion as to the allowance of the fines charged by the association in its statement of the account. The by-laws provide that a failure to make monthly payments on stock for any month prior to the tenth day of the month after due, shall subject the member to a fine of ten cents for each share in arrears, and the same for every month thereafter during delinquency; and the certificate of stock contains a similar provision. The by-laws also provide for a fine of ten cents for every one hundred dollars borrowed per month for each month during delinquency, upon a failure of a borrowing member to meet the payments of interest or premium; and the note provides that if any payment is not paid when due fines shall be added as provided by the by-laws. The mortgage, however, makes no mention of fines. The condition of that instrument is in substance that if the parties of the first part shall pay or cause to be paid unto the party of the second part the sum of $1,500 on or before ten years after date, with interest, premium and installment of dues, as provided by said note, in monthly payments payable on or before the last day of each month of not less than twenty-four dollars, according to the conditions of said note, and shall pay all taxes on the property, and keep the buildings insured for the benefit of the said second party, then the mortgage shall cease and be null and void. And a subsequent clause provides that in case any installment of principal, or any part thereof, or any interest, premium or installment moneys, or any part thereof, shall remain due and unpaid for sixty days, then the whole principal sum, together with interest and premium, shall, at the option of the second party, become due and payable forthwith. In the clause containing the power of sale, it is provided that out of the money arising upon a sale of the premises the mortgagee may retain the principal, premium and interest, together with costs and expenses of sale, and one hundred dollars for attorney,

solicitor or counsel fees, and that the overplus, if any, shall be paid to the mortgagors, their heirs or assigns.

There was no personal service of process upon either Mr. or Mrs. Wrighter, and hence no personal judgment is permissible against them for any delinquency. The amount found to be due may be satisfied as far as the proceeds will go out of the mortgaged premises. The defendant in error bank does not seem to have constituted itself personally liable for the indebtedness, except possibly to the extent of its tenders; but they were made to secure a release of the mortgage. Hence, in this suit, the amount due is material only as it determines the amount for which the mortgage stands as a lien upon the premises covered thereby. The rule is laid down that while accrued fines are an essential part of the liability of the member, they do not become part of the mortgage debt unless made so by the mortgage. (Endlich on Bldg. Assn., Sec. 416; Thompson on Bldg. Assn., Sec. 181; Bowen v. Lincoln B. & L. Assn., 51 N. J. Eq., 272.) This consideration disposes of the item charged for fines upon the loan for defaults in payments of interest and premium adversely to the association, so far as the indebtedness is secured by the mortgage. In regard to the fines charged against the stock for defaults in payment of stock dues, the certificate provides that upon withdrawal the holder shall receive all money paid for stock dues (except fines), with interest at fixed rates according to the time of withdrawal—in this case at eight per cent per annum. And it is provided in the by-laws that all stock shall be subject to a lien for the payment of unpaid fines, and that the same may be at any time charged off against the stock, and deducted from the credits thereon. Fines against the stock, therefore, if reasonable, would be allowable to the association in determining the withdrawal value of the stock. But the only evidence in relation to such fines is that they amounted to $72. No explanation of the method employed in charging them, nor the time or times when the defaults occurred and the charges made, is attempted. The only

defaults shown in the testimony is in the payment of the dues due in July, 1899, which were not paid until December following, and the entire failure to make any payments for dues accruing after July, 1899. The fine provided for is ten cents per month on each share during the period of delinquency. It is apparent that one dollar and fifty cents per month, which is ten cents per share on fifteen shares, will not amount to $72 in eighteen months, which was the period of delinquency shown on the trial. The courts uniformly refuse to permit the repeated imposition of the same fine increased, every month, upon the principal of arithmetical progression. (Endlich, Sec. 424.) To support these fines charged, there should have been some evidence to show that defaults had occurred authorizing their imposition. It is not enough for the assistant manager of the association to say that they were charged. Liability for such fines depends upon default of duty in paying dues, and the facts should be shown as a basis for the liability. Again, in the absence of such testimony, it is impossible for the court to know how they were computed, and whether, as charged, they were reasonable, since it is impossible even to determine that they were computed at the rate and in the manner permitted by the by-laws, and in the contract. While it appears that there were defaults for eighteen months immediately preceding the trial, the fines chargeable for such defaults would amount only to the sum of $27. But as the charges testified to are not at all explained, and it is not even stated that they were charged for the defaults above named, we think the charge should not be allowed.

Interest and premium are recoverable to the date of the decree, March 11, 1901. (Racer v. International B. & L. Assn (Ind. App.), 63 N. E., 772; Union B. & L. Assn. v. Masonic Hall Assn., 29 N. J. Eq., 389; Cantwell v. Welch (Ill.), 58 N. E., 414.) In stating the account, therefore, the debtors should be charged the principal sum, $1,500, with interest and premium due and unpaid up to March 1, 1901, which amounts to $313.50, being nineteen months at

$16.50 per month; insurance paid by the association, $14, and interest thereon, $2.30. This all amounts to $1,829.80. From this must be deducted a credit of the withdrawal value of the stock. This is shown by the evidence to be as follows at time of trial, omitting fines: Amount of dues paid, $450; interest added, $132, making $582. To this should be added one month's interest to date of decree, amounting to $3.00, making $585. Deducting a withdrawal fee of $2.50 per share, or $37.50, leaves a balance of $547.50, which constitutes the withdrawal value. When this amount is credited upon the debt, the remainder gives the amount due at the date of decree, viz: $1,282.30.

Neither of the tenders made by the defendant in error were sufficient to cover the amount due at the time they were made, and hence were insufficient to throw the costs upon the plaintiff in error. The latter is also entitled to a judgment for one hundred dollars as an attorney's fee, as provided in the mortgage, in addition to the sum above named, and the other costs.

The judgment of the District Court is reversed, and the cause will be remanded with directions to that court to render a judgment of foreclosure on the cross-petition of the plaintiff in error, defendant below, for the sum of $1,282.30, with interest thereon at the rate of eight per cent per annum from March 11, 1901 (the date of the former decree), and for the further sum of one hundred dollars as an attorney's fee, in addition to the other costs.

Corn, C. J., and Knight, J., concur.